# EXHIBIT A

## AMERICAN ARBITRATION ASSOCIATION

_____

MERIT ENERGY OPERATIONS I, LLC,     )

Claimant,     )

v.     )     AAA Case No. 01-19-0003-2388

EASTERN SHOSHONE AND NORTHERN     )

ARAPAHO TRIBES,     )

Respondents     )

_____ )

## <u>INTERIM FINAL AWARD ON THE MERITS RESERVING ATTORNEY FEES AND COSTS</u>

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs, and allegations of the Parties, hereby find and AWARD as follows:

## BACKGROUND

Historically the Northern Arapaho and Eastern Shoshone Tribes came from different geographical locations and political alliances. The Eastern Shoshone were associated with the Nez

Perce, Mandan tribes of the Bitterroot Mountains and Pacific basin. The Arapaho derived from a plains culture. As white settlers pushed in from the east, plains tribes like the Arapaho were pressured to move further west. This caused conflict with the eastern tribes of the Shoshone. The Arapaho and their plains allies, including the Cheyenne and Lakota Sioux, clashed increasingly with the Shoshone. By 1880 the Eastern Shoshone had reached an accord with the federal government and many of the Tribal members became scouts for the United States cavalry and in that capacity often attacked Arapaho camps.

In spite of this longstanding enmity between the Northern Arapaho Tribe and the Eastern Shoshone Tribe (hereinafter "the Tribes" unless individually designated), the federal government consolidated the Northern Arapaho onto the existing Eastern Shoshone reservation in 1878. This resulted in the only U.S. Indian reservation co-inhabited by two independent tribes. As a result of their combined reservation, they jointly occupy the lands constituting the Wind River Reservation ("Reservation"), a 3500-square-mile area of northwestern Wyoming. It includes the Circle Ridge oil field, an area of approximately 1,930 acres.

Like other federally-recognized tribes, the Tribes have a special legal relationship with the U.S. government. The government serves as Trustee to them and holds their reservation land in trust for their benefit, and accordingly must approve major tribal legal commitments. A significant body of federal law governs the relationship between individual tribes and the U.S. government, including a number of statutes passed by Congress. The federal government's responsibilities to the Tribes are carried out by the Bureau of Indian Affairs (BIA) within the Department of the Interior (Interior). For oil and gas leases, federal law requires that any lease or renewal of a lease be approved by the Secretary of the Department of the Interior ("Secretary"). 25 U.S.C. § 2102; 25 C.F.R. § 227.5.

Today, the Tribes manage their oil and gas resources through a joint governing body known as the Wind River Inter-Tribal Council ("WRITC"). Each Tribe elects six members of the twelve-member WRITC even though the population size of the two tribes differs considerably.  Each Tribe elects a Chair and a Vice-Chair, and presiding responsibilities at monthly Council meeting alternate back and forth between the Tribes.

The WRITC makes all final decisions regarding the development of these resources—including decisions relating to the leasing of oil interests on the Reservation.  The proceeds of the royalties go to the tribal governments to pay for schools, elder care, heating oil and healthcare for its constituents, among other essential governmental services. Tribal representatives from both the Northern Arapaho and Eastern Shoshone testified at length as to the poverty and desperate social needs on the Wind River Reservation. Karen Snyder, Vice President of the Shoshone Business Council, testified that "because of the high unemployment rate, for some tribal members, their entire annual income is based on the royalty, which is approximately $100 a month." (Tr.895) With additional royalties the Tribes could fund currently unfunded youth and senior programs. (Tr.1022) She emphasized that for this reason "the royalty is really, really important to us." (Tr. 904)

In December 1999, the Tribes' Joint Business Council entered into an "Oil and Gas Lease…For the Circle Ridge Field" with Marathon Oil Company (hereinafter "the Lease").  It stated: "The term of this lease shall be twenty (20) years ("Primary Term"), beginning on the Effective Date" of January 1, 2000.  It also provided "a preferential right in Lessee to renew the lease…upon the expiration of the Primary Term."   In 2016, Merit Energy Operations I, LLC ("Merit") acquired all of Marathon's producing oil properties on the Reservation with the Tribes' knowledge and consent and the approval of the Interior Secretary.

Merit is a privately held upstream oil and gas company acquisition company. Its strategy is to acquire and operate mature oil and gas assets.  Merit, of course, seeks to maximize profits for its investors, which include university endowments, public pensions, and private foundations. (Brister Tr. 107) Merit bought the Lease from Marathon for $92.6 million in 2015 and since 2016, has invested an additional $4.2 million to maintain and, in some instances, increase the productivity of the Lease.  Since Merit purchased the Lease, it has paid the Tribes royalties of over $38 million and tens of millions in severance taxes, (Tr.1057) while Merit has netted about $ 30.4 million.

In January 2018, twenty-four months before the expiration of the Primary Term, Merit and the Tribes began negotiating a potential renewal of the Lease.  The Tribes and Merit engaged in multiple formal and informal Lease-renewal discussions during 2018 and 2019.  Over the course of these negotiations, the parties discussed a variety of proposals, but ultimately were unable to reach agreement prior to December 31, 2019, when the Primary Term was set to expire.  Lease renegotiation attempts ended during a Merit meeting with the WRITC on September 25, 2019. The Tribes formally notified Merit on September 30, 2019 that they would not renew the Lease on January 1, 2020.

## PROCEDURAL HISTORY

Merit initiated this arbitration less than two weeks later on October 11, 2019 with its Demand for Declaratory Relief.  The parties stipulated that the Lease would continue until 120 days after a final award in this arbitration or upon a settlement between the parties, whichever occurs first. Merit's Demand seeks a declaration that the Lease did not terminate on January 1, 2020.  Alternatively, it seeks a declaration that Merit is entitled to renew the Lease on "reasonable terms" due to its "preferential right" to renew.  In turn, the Tribes filed an answer and

counterclaims, seeking, *inter alia*, a declaration that the Lease expired on January 1, 2020 and that the Tribes had the right to decide not to continue to lease their lands to any party.

The parties agree that pursuant to the arbitration provision in the Lease, Section 20.0.1, this arbitration is conducted under the AAA Commercial Arbitration Rules, and that the laws of the United States and the Tribes shall control (§23).  Following a preliminary hearing on January 22, 2020, the Panel issued a Scheduling Order on March 12, 2020.   Both Merit and the Tribes filed motions seeking preliminary rulings, all of which were denied in a March 23, 2020 Memorandum Opinion and Order Denying Preliminary Judgment Motions ("Preliminary Ruling").

Following the Preliminary Ruling, document exchange and deposition discovery occurred, although disputes arose concerning certain documents in the possession of a technical consultant to the tribes ("MI3") and another consultant who worked briefly for the Wind River Sovereign Authority ("WRSA").  In April 2020 the Panel issued a subpoena directing the production of certain categories of documents.  It subsequently held several telephonic hearings related to these issues, issued a further subpoena directing MI3 to provide documents, eventually reviewed a number of contested documents in camera, and ultimately directed that many of them be provided to Merit.

Parallel with the Panel's consideration of this matter, Merit petitioned the Wyoming federal district court to compel production from MI3.  On August 7, 2020, the court denied Merit's petition. Also during the pendency of this arbitration, on February 13, 2020, Merit filed a second action in Wyoming federal district court seeking to set aside the BIA rule that is the basis for one of the Tribes counterclaims in this proceeding.   In its April 29, 2020 Order Denying Preliminary Judgment, the federal court found that Merit did not have a probability of prevailing on the merits, in part because the rule it sought to void was developed with significant oil and gas industry participation in a comprehensive negotiated rule-making process.

Pre-hearing briefs were filed on September 29, 2020, and a (masked and Covid-appropriately-distanced) four-day hearing was held in Jackson, WY on October 5-8, 2020.  Post-hearing briefs were filed on October 23, 2020.  Based on all of the aforementioned briefing, oral argument, live fact and expert witness testimony, and full consideration of the parties' exhibits, the Panel concludes and holds as follows:

## ISSUES AND ANALYSIS

Merit's Demand for Declaratory Relief initiating this arbitration requested two rulings: (1) that "the Lease shall continue in full effect as long as the Lease continues to produce in Paying Quantities" and (2) "In the alternative, a declaration that Merit is entitled to renew the Lease at the conclusion of the Primary Term."  In light of the Panel's Preliminary Ruling denying judgment on the pleadings because, "Whether parties to a contract have acted in 'good faith' is a fact issue," Merit's pre-hearing brief added a third major issue: (3) "The evidence will establish that the Tribes did *not* act in good faith." (original emphasis) Indeed, evidence regarding "good faith" received more time, testimony, and evidence than any other hearing issue.  Merit's pre-hearing brief also raised a fourth issue: (4) that "the panel can–and should–set reasonable renewal terms."   A fifth and final substantive issue for Panel resolution is (5) whether the Tribes are entitled to relief on any of their counterclaims pertaining to environmental violations, lack of 2020 capital investment in the field, and failure to pay full royalties assessed by the BIA.

### I. LEASE CONTINUATION SO LONG AS PAYING QUANTITES EXIST

The essence of this dispute turns on whether the Lease language allows or requires a renewal of the Lease following expiration of the Primary Term and, if so, under what terms.  A

mineral lease is a contract and so must be interpreted under the legal doctrines applicable to contracts. [1] *United States v. Ohio Oil Co.,* 163 F.2d 633,637 (10th Cir., 1947); *State v. Moncrief,* 720 P. 2d 470 (Wyo.1989).  In the absence of ambiguity, a contract will be enforced according to its terms and no further rule of construction is necessary or appropriate.  *Payless Shoesource v. Travelers Companies, Inc.,* 585 F.3d 1366 (10th Cir. 2009); *Sinclair Oil Corp. v. Republic Ins. Co.,* 929 P.2d 535, 539 (Wyo.1996); ("[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them.");  *Doctors' Co. v. Insurance Corp. of Am.,* 864 P.2d 1018, 1023 (Wyo.1993); *Employers Reinsurance v. Mid-Continent,* 358 F.3d 757 (10th Cir. 2004).

The pivotal language of this Lease is found in § 5.1. The first sentence of that provision addresses the crux of the current dispute:

> The term of this lease shall be twenty (20) years ("Primary Term"), beginning on the Effective Date of this lease with a preferential right in Lessee to renew the lease for a successive period of ten (10) years each upon such reasonable terms and conditions as may be agreed to by the parties hereto and approved by the Secretary, unless otherwise provided by law, upon the expiration of the Primary Term.  There must be production in Paying Quantities of any Oil and Gas at the expiration of the Primary Term in order for this lease to continue beyond the Primary Term. The environmental releases and indemnifications contained in Section 12 of the lease shall survive the expiration or termination of this lease.

---

[1]  Federal common law incorporates traditional methods of contract interpretation, so following state precedent is appropriate. *Rosebud Coal Sales Co., Inc. v. Andrus, 667 F.2d 949 (10th Cir., 1982)*; Local Div. 732, *Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority,* 667 F.2d 1327, 1138 (11th Cir. 1982), and Tribal law does not control the interpretation of oil-and- gas leases approved by the Secretary of the Interior.  *See* Shoshone and Arapaho Tribal Law & Order Code § 11-5-11 (2010) ("Nothing in this Code shall affect exploration, development, production, or transportation of oil and gas under any mineral lease or other contract approved by the Secretary of Interior.").

The Lease language that the term "shall be twenty (20) years ("Primary Term"), beginning on the Effective Date of this lease with a preferential right in Lessee to renew the lease for a successive period of ten (10) years each upon such reasonable terms and conditions as may be agreed to by the parties hereto and approved by the Secretary, unless otherwise provided by law, upon the expiration of the Primary Term" derives from a 1916 Act of Congress that specifically authorized the Secretary of the Interior to enter into oil and gas leases for the Wind River Reservation. The 1916 Act provided that "[l]eases shall be for a period of twenty years with the preferential right in the lessee to renew the same for successive periods of ten years each upon such reasonable terms and conditions as may be prescribed by the Secretary . . . ." 39 Stat. 519. The parties agree that the second condition for renewal, consistent production in Paying Quantities, has been met.

Merit's initial contention is that establishing production in paying quantities is all that is required to "continue" the Lease and, therefore, "renewal" is irrelevant and the Lease remains in effect after January 1, 2020.  Such "held-by-production" ("HBP") habendum clauses contemplate that the lessee would be entitled to continuous operation so long as oil is produced on the property. *See e.g.*, *Blaser Farms, Inc. v. Anadarko Petroleum Corp.,* 893 F.2d 259 (10th Cir. 1990) (a lease with a primary term also provided that the lease "'shall remain in force for a term ending July 31, 1984 and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced.") *See also, Christianson v. Champlin Refining Co.*, 169 F.2d 207, 208 (10th Cir. 1948) (similar held- by-production language); *True Oil Co. v. Gibson,* 392 P.2d 795, 796-97 (Wyo.1964) (same). Merit's lease for the Wind River Maverick Springs Field contains similar language, and all parties agree that the term of *that* lease continues as long as Merit produces oil from it.  This Lease, however, contains no such language.  In fact, the Lease's plain language does not indicate

that production in paying quantities is anything other than a necessary—but not solely sufficient—condition for renewal. There is no logical principle that can explain why Merit should be able to "continue" the Lease indefinitely so long as there is production in Paying Quantities, but if Merit wants to "renew" the Lease it must satisfy the other conditions in § 5.1 (i.e., agreement upon reasonable terms and approval by the Secretary). Such an interpretation would render the first sentence of section 5.1 superfluous.[2]

None of the parties provided legal precedent directly addressing the interpretation of the Lease language. In *Oryx Energy Co. v. County of Kern,* 21 Cal.Rptr.2d 221, 230, 17 Cal.App. 4th 48 (Cal. App. 1993), the California Court of Appeals interpreted a statue which authorized the Secretary of Interior to reduce royalties if local tax valuations increased to make operation of the lease uneconomic and the lease could not be renegotiated. Interpreting language identical to that found here, the California Court held "neither the original leases…nor any of the subsequent renewal term leases provides an absolute right to renew." *Oryx Energy* 21 Cal.Rptr.2d at 229.

Inclusion of the word "Primary" (which was not in the 1916 Act lease) preceding "Term" does not change the fundamental provision that "The term of this lease shall be twenty (20) years."

---

[2]  As the Panel stated in its Preliminary Ruling, the Tribes' argument that it could simply terminate the Lease unilaterally would *also* read Merit's preferential right out of Section 5.1. It held that "Something more is contemplated in section 5.1 than simply establishing production in paying quantities by Merit or an unfettered right on the part of the Tribes to terminate the Lease any time after the Primary Term." This initiated an extensive examination of the parties' "good faith" during the negotiation to seek to establish the upper hand under the first sentence of § 5.1. As we discuss below, the Panel is satisfied as to both parties' good faith in the negotiations. Because the language of the first sentence of section 5.1 is not a model of clarity, as we also discuss below, the Panel examined the parties' contemporaneous approach to the language as an additional way to attempt to divine the meaning of the sentence.

Indeed, "Primary Term" appears in quotes within parentheses to indicate it would thereinafter mean "term of…twenty (20) years."  This is further underscored by its use in the very next sentence: "in order for this lease to continue beyond the Primary Term" (again, a capitalized defined term).  Finally, the third sentence of § 5.1 provides explicitly that environmental and indemnification provisions "shall survive the expiration or termination of this lease."  If the Lease terms were to continue beyond the 20-year primary term, this sentence could have so provided, but it did not.[3]

Merit cites to three other provisions of the Lease in an attempt to find support for its interpretation: § 5.2, involving under-construction wells, § 5.3, involving temporarily stalled wells, and § 7.2, involving limitations on developing horizons. None of these provisions lend any support to Merit's held-by-production interpretation of the Lease. At best, the provisions do evidence the significance of achieving "production in paying quantities" by being thorough in its definition, so that Lessee's preferential right to renew is less likely to be nullified. But sections 5.2, 5.3 and 7.2 only provide alternative definitions of "production in paying quantities." They do not change the other requirements of the first sentence of section 5.1, namely, an agreement among the parties as to reasonable terms and conditions and approval by the Secretary.

---

[3] The Tribes' expert witness, Mr. Wimberley, discussed an updated 2020 version of the Lease form at issue in this case where the word "Primary" has been eliminated in favor of simply the word "Term." The Panel notes that the phrase "Primary Term" is a term of art in the oil and gas industry and that the Interior Department itself has drawn distinctions between "Term" and "Primary Term" (*Williams & Meyers Manual of Oil and Gas Terms,* 10th Ed. P. 826; *Celsius Energy Co. v. Southland Royalty Company,* 99 IBLA 53 (1987)). In this case, however, the Panel found little in the plain language to support the view that "Primary Term" was meant in its typical habendum clause use. While the Panel has not been presented with any authority, it concludes that the change in the agency's form was either insignificant or clarifying rather than evidencing an intent to change the meaning of the form.

10

Although we hold that the language of the Lease itself is dispositive, we also find that the parties' course of conduct throughout their lease renegotiation (and indeed before then, dating back to Merit's first presentation to the Tribes in June 2016) confirms that none of them ever considered or communicated to the other at any time that the Lease would automatically renew at the end of twenty years on the same terms as previously.  Merit's June 21, 2016 introductory Power Point presentation to the Tribes as part of its seeking Tribal assent to the assignment from Marathon states on its "Leases: Terms and Provisions" page that the Maverick Springs lease term is "As long as the Lease Produces."  On the same page, the "Term" of the Circle Ridge Lease states, in contrast, "20 years" and "Preferential Right to Renew."

Similarly, in each of the formal lease negotiation meetings, Merit made a Power Point presentation in which a slide titled "Wind River Fields Terms" indicated a clear distinction between the Maverick Springs "held by production" lease and the Circle Ridge and Steamboat leases.  On the "Expiration Date" row of Merit's slide indicating the terms of the leases, the expiration date for the Maverick Springs lease is indicated as "None."   In contrast, the Expiration row of the same slide indicates that the Circle Ridge and Steamboat leases have specific expiration dates ("Dec 31, 2019" and "Dec 31, 2020" respectively).  In short, Merit's Terms slides, presented at each of the in-person negotiation sessions, indicate unambiguously that the "*Termination* date of this Lease is Dec 31, 2019."   The word "termination" is unambiguous, and Merit's Power Point used it repeatedly in every meeting.

## II.  LEASE CONTINUATION UNDER MERIT'S "PREFERENTIAL RIGHT"

Merit's alternative contention is that if the Lease does not renew automatically due to it producing in paying quantities, then Merit's "preferential right" entitles it to renewal on other terms.  Merit's position regarding what the subsequent terms should be evolved during the

arbitration.  Pre-hearing, Merit appeared to contend that the Lease would continue at the 29% flat royalty rate it had been at during the final six years of the primary term.  Later in the hearing and post-hearing, Merit advocated that this Panel should declare that the new lease terms will be a 24% flat rate royalty for a 20-year period.

We address first the meaning of Merit's preferential right.  In *Allen v. Smylie*, 92 Idaho 846, 452 P.2d 343 (1969), the Idaho Supreme Court interpreted very similar language in a case involving a state-issued phosphate mineral lease. Monsanto had acquired the lease under a statute providing that five years after "the lease is issued, the leaseholder shall be given a preferential right of renewal…"  Monsanto renewed its lease five years later and thereafter sought a further renewal. Because the statute had been amended, Monsanto's first renewal included new held-by-production statutory language.  At the anniversary of the third renewal period, plaintiff Allen sought to acquire the lease and contended that it had not been properly renewed under the original statute. The Idaho Supreme Court ruled that after the initial five years, the subsequent lease was not a renewal, but rather a new lease;

> It should be noted that while the 1948 law (originally adopted in 1939) and the 1967 law speak of a *preferential right of renewal*, that term is *not* synonymous with *an option to renew*. The renewal preference is only on such terms as the Land Board may propose. It would be more accurate to speak of the right given by the statutes as *a right of first refusal*. 452 P2d at 348 (italics added).

The phrase "preferential right to renew the lease" is also often found in grazing leases. *See e.g. Jeffries v. Hassell,* 197 Ariz. 151, 3 P.3d 1071 (Ariz. App. 1999); *Office of State Lands v. Mule Shoe Ranch Inc*., 252 P.3d 951, 2011 WY 68 (Wyo. 2011). Merit cites one of these, *Frolander v. Ilsley,* 264 P.2d 790, 72 Wyo. 342 (Wyo. 1953), for the proposition that "The right to preference is a very substantial right" [citing *Manning v. Perry,* 48 Ariz. 425, 62 P.2d 693] at 264 P2d 794.

We agree.[4]  However, these cases all agree that this right is not absolute[5] and recognize that such a preference only gives the lessee the legal right of first refusal.  More recent cases also tend to emphasize the trust responsibility of the issuing state authority.[6]

Like the western states' grazing land, tribal lands are under government trust.  In 1982, Congress passed both the Federal Oil and Gas Royalty Management Act ("Royalty Act") as well as the Indian Mineral Development Act ("Mineral Development Act"). The Royalty Act was designed to improve royalty collection, management and enforcement of royalties owed to tribes, and to increase tribal control over royalty management. 30 U.S.C. § 1701. The Mineral Development Act significantly expanded tribes' rights in this area, authorizing them to enter into mineral agreements, but only with government approval.  The purpose of the Act was, "first, to further the policy of self-determination and second, to maximize the financial return tribes can expect for their valuable mineral resources."  S. Rep. No. 472, 97th Cong., 2d Sess. 2 (1982); *Quantum Expl., Inc. v. Clark*, 780 F.2d 1457, 1458 (9th Cir. 1986).

---

[4] None of the cited cases involve an oil and gas lease that was actively in production at the expiration of the Primary Term. The Panel and the Tribes' expert recognize that achieving production in paying quantities is no small endeavor and, therefore, is an important factor distinguishing the current case from the cited cases. That said, § 5.1 clearly sets out additional conditions on the preferential right, and is therefore consistent with the cited cases inasmuch as they stand for the proposition that the preferential right, while substantial, is not absolute.

[5]*Frolander* 264 P2d 796 citing *Kerrigan v. Miller*, 53 Wyo. 441, 84 P.2d 724, 729; *State v. Jones,* 94 Ariz. 334, 385 P.2d 213 (Ariz. 1963)

[6]  See e.g. *Williams v. Greene,* 95 Ariz. 378, 390 P.2d 907 (Ariz. 1964)**;** *Mule Shoe Ranch,*252 P3d 958; *Allen v. Smylie,* 92 Idaho 846452 P.2d 343, (1969);*Hagood, Application of*, 356 P.2d 135 (Wyo., 1960)

Merit interprets the Lease as giving it an absolute right to renew at a "reasonable" rate and asks the Panel to declare what is reasonable. In doing so, Merit presented substantial evidence indicating what other leases on the Reservation and in the basin provide.  When Merit spent $92.6 million to purchase and over $4 million in maintenance and upgrades on the Circle Ridge Lease (and based on historic behavior), it believed it would have a preferential chance to participate in the operation of that Lease. On the other hand, proper contract interpretation in this context must honor the Tribes' right of sovereignty and self-determination.

In analyzing the Lease language, we must interpret it to recognize dual purposes and read the instrument as a whole. Under well-accepted contract principles, all the Lease language must be given meaning. *See, e.g. Rosebud Coal Sales Co., Inc. v. Andrus,* 667 F.2d 949,951 (10th Cir., 1982*);Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 781 (Wyo. 2019) ("We presume each provision in a contract has a purpose, and we avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless.")

In examining the actual language of § 5.1, in addition to Primary, the word "preferential" must be given meaning. By definition "preference holders have a superior or priority position against others for the purpose of receiving a grazing permit or lease." *Stewart v. Kempthorne*, 554 F.3d 1245,1248 (10th Cir. 2009)(quoting 43 C.F.R. § 4100.0-5)  The Lease therefore appropriately gives the Lessee, who has made significant investment in the Leasehold, a first and/or last right to renew vis-à-vis terms offered by third parties.  *Allen v. Smylie*, *supra* 452 P2d 348.  A preferential right is thus a "*very substantial* right," but not an absolute right.  *Frolander v. Ilsley*, 264 P.2d 790, 794 (Wyo. 1953).

We conclude, as did the *Allen* court, that Merit's preferential right is not an absolute right to renew.  Rather, in the event Merit and the Tribes are unable to reach agreement on mutually-

14

acceptable terms, Merit's preferential right is a right of first refusal vis-à-vis any third-party proposals.

### III.  TRIBAL "BAD FAITH" DURING THE LEASE NEGOTIATION PROCESS

The Lease contains express good faith provisions. The first one talks about not unreasonably denying consent.  Section 35 states that: "Parties agree to cooperate fully with each other and to act reasonably and in good faith and in a timely manner in all matters hereunder so that each of them may obtain the benefits to which they are entitled to hereunder and for which they have negotiated."  It further states: "Both parties agree to negotiate in good faith and without delay as to all matters requiring negotiation."

Merit's hearing testimony sought to prove that the Tribes violated this express "good faith" duty.  Its post-hearing brief alleged that "the Tribes delayed, refused to respond, ignored relevant economic information, asked for information that they already had, and failed to meaningfully engage with Merit's offers," while "all the while" indicating to Merit that they intended to renew. Merit contended further that the Tribes ignored their own expert's analysis of the desirability of a tiered-royalty approach.  Its brief further stated that the Tribes "based their decision not to renew on a single, unsupported presentation by DEMD that they saw one day prior," along with "hearsay statements from MI3, a self-interested and newly arrived party." Merit also contends that ultimately voting not to renew the Lease similarly constituted bad faith.

A large amount of hearing time was devoted to chronicling the specific back and forth during the Lease negotiation process.  Suffice it to say in summary that over the 21-month period from January 2019 through September 2019 Merit met formally with the WRITC seven times (six

in person, one via conference call due to Merit airplane mechanical difficulties) to discuss lease terms.  All meetings were recorded and detailed minutes were written.

The WRITC constituted the legislative body for the Tribes and was also responsible for overseeing the operation of some 55 different social service and infrastructure programs, including courts, police, transportation, education, health, housing and others.  Many programs were joint Tribal operations, although in some areas, such as health, each Tribe operated separately. (Eastern Shoshone, for example, relied on the federal Indian Health Service, (IHS) while Northern Arapaho took its apportionment of IHS funding directly and established and ran its own clinic.)  One Merit witness described attending a Tribal election candidates forum in which the ten policy areas discussed did not include the Lease or Merit -- even though oil and gas royalties were a major source of program funding and the primary source of funding for per capita distributions to Tribal members.

As indicated, the negotiations between the parties were replayed at the hearing in exhaustive detail. While Merit would have preferred that the Tribes address certain items (and vice versa), our review of the negotiations lead us to conclude that both sides conducted themselves in good faith.  Poor communication undoubtedly occurred in many instances, but not bad faith.

The evidence established that three factors contributed to the Tribes and Merit ultimately being unable to reach agreement.  The first was that the Tribes wished to continue with a flat rate royalty, Merit did not want to continue on that basis, and the gap between the parties' flat rate proposals appeared too large to be closed.  The second was that Merit wanted a tiered royalty structure, but this was new, complicated, and would benefit the Tribes only if Merit made substantial additional capital investments, which it did not commit to do.  The third factor was that

three different Trustee-related advisors (BLM, MI3 and DEMD) all advised the Tribes in the final weeks of the negotiation against Merit's royalty proposals and suggested an alternative future path.

The first factor was the Tribes' desire for continuing with a flat rate royalty. This was the type of royalty they were familiar with and had experienced for many previous decades. It also provided a somewhat predictable, if possibly declining, royalty. Merit's expert called it "probably the most common type of royalty structure in Wyoming." (Tr. 442). During the immediately-preceding six years of the Circle Ridge Lease the Tribes had received a flat rate royalty of 29%.

Merit's first flat rate proposal, at a WRITC meeting in March 2018, was 22%, a 24% decrease from what the Tribes had been receiving. Three months later, in the next negotiation meeting in June 2018, Merit reduced its flat-rate proposal to 20%, a 31% decrease from the then 29%. Although various "signing bonus" amounts and land lease rental amounts were proposed at various points, these were economically inconsequential compared to the dollar amounts resulting from the royalty rates. In the next four negotiation meetings (from October 2018 through September 2019), Merit continued to offer its 20% flat rate proposal, including in its presentation at the start of the final September 25, 2019 meeting. Merit insisted the revenue would be made up and exceeded by increased production spurred by increased Merit investment. Indeed, in late 2019, more than a month after the September meeting and two weeks after filing this arbitration, Merit again proposed a 20% flat rate royalty at a meeting on October 29th.

On the other hand, the Tribes proposed to continue the 29% royalty rate, although sweetening this proposal by eliminating any bonus payment (as previously required) and by offering a full twenty years rather than the contractual ten-year term. Although one WRITC member raised the possibility of a 25% flat rate in early October 2018, the evidence established that this was one individual's musing rather than an official or WRITC-authorized proposal. Less

than two weeks later, on October 15, 2018, Chairman Wagon confirmed the Tribes' proposal was 29% for 20 years.  In a private caucus, the Tribes discussed lowering their flat-rate proposal to 28.5%, but ultimately did not present this option due to Merit being at 20%.  Also, in October 2018, the Tribes long-time and trusted BLM trustee advisor advised that a flat 29% royalty was desirable and should be negotiated for.  And at the final September 2019 negotiation meeting, the Tribes' 29% for 20 years proposal was reaffirmed by WRITC member Shakespeare.  The absence of any movement to close the gap between the Tribes 29% proposal (continuing the then-current rate) and Merit's 20% proposal (which would lock in a 31% rate reduction) was therefore one major factor in the new lease negotiation being unsuccessful.

The second factor that kept Merit and the Tribes from agreeing on terms, and the reason for Merit's not moving off its low 20% flat rate proposal, was that Merit wished to convince the tribes to accept a new lease on a "tiered" rather than a flat-rate royalty basis.  This, however, introduced an element of unpredictability and the need for more study for the Tribes.  It stemmed from Merit's analysis that production from Circle Ridge would inevitably decrease over time as the field "matured," with the result that dollar amounts received by the Tribe (including at a flat 29% royalty) would also decrease.  To avoid this happening, Merit's tiered approach proposed to set the new lease at a reduced Tribal royalty so that Merit would receive additional money it could then reinvest in the field to boost overall production and maintain something closer to a stable royalty income.

Under this new capital investment scenario, more oil could ultimately be produced so the Tribes could receive more total dollars, even though they were receiving a lower percentage.  This concept came to be characterized as the Tribes' receiving "a smaller percentage of a bigger pie." Merit estimated that additional investment somewhere in the $25-35 million range would be likely

to boost production enough to boost Tribal (and Merit) income from current levels.  Merit's "quick summary" at the final September 2019 meeting explained that "we're trying to compete on [what] is our capital" available to invest in various locations and "these [possible $25-35 million] dollars are also competing against our entire portfolio up here" and other "lease terms … are obviously substantially better for us [Merit]."  Accordingly, Merit's proposal did not commit any specific investment amount nor, strictly speaking, even to a definite investment. (Merit Ex 121).  Also related: the Northern Arapaho Tribe's consultant, accepting the theoretical concept that increased investment could bring the Tribe more dollars, had nonetheless recommended in January 2019 against accepting it absent a Merit investment commitment.  "We need to see what Merit comes up with for the investment plan." (Merit Ex 17).

A second dimension of tiered royalty complexity related to the speed at which field production would decline without new investment. The mathematical calculation of this "decline rate" was based on complex geoengineering data and projections.  Merit appreciated that the Tribes lacked sufficient technical expertise to feel confident about the number and urged the Tribes to hire a consultant to help them evaluate it.  It also offered several times to pay for such a consultant (up to $30,000).  Although reluctant to adopt the tiered approach, the Tribes learned that their BIA trustee's Division of Energy and Mineral Development (DEMD) would fund a petroleum engineering consultant for them.  DEMD recommended that the Tribes work with MI3 consultants to get a grant and they applied.  Although funding exceeding $600,000 was ultimately approved, notice of this grant approval was delayed due to the federal government shutdown until August 2019, and MI3's initial preliminary evaluation was not received until September, after MI3 was named as the Tribes' consultant (Transcript P. 628).  MI3 reported to the Tribes that it did not agree with Merit's proposed 8.5% decline rate, but did not recommend an alternative, so the Tribes

were not in a position to be able to feel confident regarding this key element of the tiered approach. Taken together these complexities fostered the Tribes' unwillingness to accept a new tiered approach, a second major factor that prevented the parties from coming to agreement.

A third factor that prevented Merit and the Tribes from reaching agreement was that the Tribes' three federal government trustees all counseled them in the final weeks of the negotiation not to accept Merit's proposals.  As stated, the Tribes' long-time BLM trustee told them that continuing a 29% flat rate was a good deal for the Tribes, and the DEMD-recommended consultant, MI3, urged not agreeing to a formula based on an 8.5% decline rate.  Then, shortly before the final September 25 negotiation meeting, a team from DEMD itself provided an analysis that, by restructuring the whole arrangement, millions of additional dollars that Merit would otherwise pay in state and federal taxes could come to the Tribes instead.  This analysis was sent to the Tribes the week before the meeting with Merit and was presented in person by DEMD personnel the day before the meeting.  DEMD, MI3 and BLM personnel were all present at the September 25th meeting as trustee advisors to the Tribes.  It is not the Panel's place, nor do we have the expertise, to dissect the DEMD analysis or opine on its thoroughness.  However, the evidence established that the Tribes were persuaded by it, welcomed it, and chose to follow it.

With this overview of the negotiation process, the Panel evaluated Merit's specific contentions regarding Tribal bad faith.

*Tribal delay and refusal to respond.*  Merit presented a detailed chronology indicating numerous times when Tribal officials were slow to respond or did not agree to meetings on dates Merit proposed.  The evidence established that Tribal officials had a broad and demanding range of responsibilities and, especially regarding requests for meetings more than a year in advance of Lease expiration, gave higher priority to other more immediate Tribal matters.  One example was

20

a protracted controversy regarding filling a Tribal judicial vacancy.  It was reasonable for WRITC members, as elected public officials, to give such decisions a higher priority.  We find accordingly that any Tribal delay was reasonable and did not constitute bad faith.

*Ignoring economic information and their own expert's advice and requesting information they already had.*  The Tribes originally made a counterclaim regarding Merit's failure to provide sufficient information, but voluntarily dismissed this on the first hearing day when testimony established that Merit had provided more information than (new Tribal) counsel previously understood.  Merit provided large amounts of technical information in various formats to various Tribal representatives, including voluminous information to Tribal consultants.  Sometimes duplicative information was requested, but this is not unusual in highly complex negotiations, especially when consultants change.  We hold that sometimes requesting duplicative information did not constitute bad faith.

Moreover, the primary gravamen of this Merit contention, and the focus of its hearing and advocacy presentations, centered on an analysis of Merit's tiered royalty approach made by Northern Arapaho consultant Jeffrey Eppink.  Testimony established that this analysis was given to Northern Arapaho WRITC members but not to Eastern Shoshone members.  Merit made much of an Eppink analysis that indicated the Tribes could receive more dollars under a tiered royalty - - if additional investment increased the field's production to certain levels.  However, Merit offered no rebuttal to Eppink's written conclusion, after his evaluation, that "these are not recommended at this point." (Merit Ex 17)

*Failing to engage with Merit's offers.*  This pattern of behavior has been addressed previously.  Sometimes other Tribal business priorities absorbed Tribal officials' attention.  Sometimes, especially until the Tribes received more comprehensive technical advice, the Tribes

simply lacked sufficient knowledge to respond to Merit's new and complicated royalty approach. Also, Tribal elections in October 2018 resulted in new members being elected to the WRITC. Understandably, the resulting transition required time for new-member orientation to their broad range of governmental responsibilities, including coming up to speed on the status of oil lease negotiations.  We hold that this failure did not constitute bad faith.

*Indicating intention to renew while not actually planning to.*  Hearing testimony and numerous documents established that the Tribes fully intended, and in fact expected, to be able to reach agreement on new lease terms for at least the first nineteen months of lease discussion.  No evidence indicated that at any time before the August 2019 approval of DEMD technical funding and subsequent trustee analysis and advice, did the Tribes not intend to enter into a new lease with Merit.  We find that hearing evidence provided no support for Merit's contention that the Tribes never intended to reach agreement and deceptively misled Merit throughout.  We hold that the Tribes did not act in bad faith in this regard.

*Deciding not to renew based on new information from "newly arrived" parties.* The evidence does support Merit's complaint that the Tribes made a relatively last-minute decision based on possibly less-than-comprehensive information.  Certainly, the WRITC's September 25th executive session decision not to enter into a new lease stunned Merit and differed from WRITC decision making on other leases, as well as from earlier Tribal actions relating to the prior Circle Ridge lease during the 1999 Conoco to Marathon transition.  However, the Tribes' making a decision based on relatively new information from some relatively-new parties does not constitute bad faith.  This is due in significant measure, as explained above, because in addition to long-time BLM trustee advice, the "newly-arrived" parties were consultants recommended by the Tribes' federal government trustee, and subsequently endorsed by the direct recommendation of the trustee

itself, the DEMD.  All of the parties acknowledge that oil and gas production leases are complex and that the federal Interior Department accordingly has an explicit statutory responsibility to advise tribes in the process of negotiating leases.  We hold that it cannot be bad faith for a tribe to listen to and accept the recommendations of its federal trustee. *cf. E.F. Hutton Southwest Properties II, Ltd., In re,* 953 F.2d 963 (5th Cir. 1992) (reliance on legal counsel on an open question of law no evidence of bad faith).

## IV.  PANEL DECLARATION OF NEW LEASE TERMS

In its hearing briefs**,** Merit urges this Panel to determine what the terms of the Lease will be going forward.  It contends that the dispute resolution section of the Lease (§ 20) empowers the Panel to determine a reasonable royalty rate and other renewal terms for the parties.  During the hearing, when asked to provide its best analysis and authority to support this late-urged position, Merit's response relied primarily on the first sentence of the Lease arbitration provision.  It states that "Any dispute … contractual in nature [related to] the respective rights and liabilities of the parties shall be subject to arbitration…."  Merit also cited a single case, *Seneca Nation of Indians v. New York*, 420 F. Supp. 3d 89 (WDNY 2019).

The Panel does not find Merit's contention persuasive and rejects that it has the legal authority to do so. We can divine no such power in the Dispute Resolution language. Our job is interpretation and application, not rewriting. *United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U. S. 593, 597, ("an arbitrator is confined to interpretation and application of the…agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the…agreement."); *See also, Monongahela Valley Hosp. Inc. v. United Steel Paper,*

946 F.3d 195 (3rd Cir. 2019); *Poland Spring Corp. v. United Food, Local 1445*, 314 F.3d 29, 33 (1st Cir. 2002).

Nor do we find Merit's cited case persuasive.  *Seneca Nation* involved a fourteen-year tribal contract with the State of New York (a "gaming compact") under which the State received different levels of revenue-sharing payments in years 1-4, 5-7, and 8-14.   The contract automatically renewed for an additional seven years unless either party objected (neither did), but it was silent as to the revenue-sharing percentage in years 15-21.   Both parties agreed that the contract had renewed automatically, but the tribe argued that contractual silence regarding the rate during the renewal period meant zero, while the State contended that it meant continuing at the rate provided in years 15-21.   The contract mandated arbitration and a panel majority ruled for the State.   The reviewing court emphasized that "the exceedingly narrow question before [it] is whether the [arbitration] panel majority 'manifestly disregarded' governing law in reaching its determination."   Two factors clearly distinguish *Seneca Nation* from this case: (1) in *Seneca* the contract automatically renewed by its terms, and (2) the *Seneca* panel ruling continued the most recent (and longest) terms rather than the panel creating a new rate altogether.   *Seneca Nation*'s holding on the "manifest disregard" issue accordingly does not support Merit's position here.

This Panel's authority and expertise (such as it is) is in the legal sphere not economics. We decline to impose our own non-expert economic conclusion on the parties' livelihoods for the next twenty years.   In addition, federal law is clear that any future lease economics are subject to the approval of the Secretary of the Interior, and not the divinations of this Panel.  25 U.S.C. § 2102; 25 C.F.R. § 227.5 Finally, one of the rare grounds for arbitration award vacatur under the Federal

Arbitration Act is "where the arbitrators exceeded their powers ...." We decline to jeopardize this Award by potential overreach.

## V.  TRIBAL COUNTERCLAIMS

In addition to contesting Merit's claims, the Tribes asserted five counterclaims in response to Merit's arbitration demand. The five claims were, in brief:

1. That the Tribes were entitled to declaratory relief that the Circle Ridge Lease terminated on January 1, 2020 under section 5.1. This is the reverse claim asserted by Merit in its Demand and has already been addressed in this Order. The Tribes also alleged that Merit should be forced to disgorge any benefit it derived from continuing to operate during the pendency of this arbitration. This situation is not the typical fact pattern for cases invoking the equitable remedy of disgorgement. *Kokesh v. S.E.C.* 137 S. Ct. 1635 1643, 198 L.Ed.2d 86 (2017 (disgorgement is ordered by courts for criminal or regulatory violations committed against the United States and it is imposed as penalty) *Cross v. Berg Lumber Company,* 7 P.3d 922, 935-936 (Wyo. 2000).

As discussed above, the Panel finds the parties acted in good faith with an honest dispute as to the meaning and effect of section 5.1 of the Lease. Because of this and because the Tribes signed the stipulation allowing Merit to continue operations (*see,* Exhibit F to the Tribes' Amended Counterclaims), the Panel finds nothing in the record warranting disgorgement by Merit.

2. That Merit breached the Lease by failing to provide certain information that the Tribes requested pursuant to the Lease. This counterclaim was voluntarily dismissed by the Tribes on the first day of the hearing and will not be addressed further.

3. That Merit breached the Lease by committing certain environmental violations described more fully in the counterclaims.

4. That Merit breached the Lease by underpaying proper royalty amounts to the Federal Government.

5. That Merit breached the Lease and the parties' stipulation regarding operations pending the outcome of this arbitration by failing to make sufficient investment in the Circle Ridge Field.

We address the last three claims described above and find in Merit's favor on all three for the reasons discussed below. The Tribes provided very little support for their counterclaims either through testimony or documentary evidence at the October 5-8 hearing.

*Alleged Environmental Violations.*  The Tribes allege that notices received from various regulators describe environmental violations in breach of sections 8.0.1 and 12.0.6 of the Lease. Specifically, they allege that

> (i) a Notice of Proposed Enforcement Action Against Marathon Oil Company for Clean Water Act Noncompliance at the Circle Ridge Facility dated March 7, 2019; (ii) an NPDES Inspection Report dated September 26, 2019; and (iii) an Underground Injection Control Notice of Multiple Violations: Overdue Mechanical Integrity Tests and Reporting, Steamboat Butte and Circle Ridge Fields, Fremont County, Wyoming dated December 12, 2019

constitute a breach of the Lease.

The only Notice or Report entered into the record was the UIC December 12, 2019 Notice (Merit Exh 161). The Tribes did not refute Merit testimony that the notices were nothing more than warnings of potential enforcement actions. Nor did they rebut their own environmental scientist's characterization of the violations as minor and subsequently corrected. (Merit Exh 262, Oct. 2019) We thus find insufficient evidence to sustain the Tribes' claims with respect to alleged

26

environmental violations and decline to find that the Notices and Reports constitute a breach of the Lease.

*Alleged Royalty Payment Violations.* The Tribes also counterclaim that Merit breached the Lease by failing to pay approximately $2.75 million in royalties to the federal government which, in turn, would be paid to the Tribes.  They request a declaration that Merit underpaid royalties due under the Lease and that this underpayment constitutes a violation of the Lease. This claim is based on a February 13, 2020 notice sent to Merit by the Interior Department's Office of Natural Resources Revenue ("ONRR"), the federal agency responsible for verifying, collecting, and then distributing to tribes' royalty revenue due from natural resource production on Indian land. ONRR's Order and Report to Pay directed Merit to pay more than $3 million due under the Steamboat Butte and Circle Ridge lease for sales from April 2017 to December 2019.

On February 13, 2020, the same day as the ONRR Order, Merit filed an action in federal district court in Wyoming seeking judicial review of ONRR's actions and requesting a preliminary injunction.  Several weeks later, on March 11, 2020, Merit filed a timely administrative appeal of ONRR's Order.  On April 29, 2020, the federal district court denied Merit's preliminary injunction request, finding that "all four factors of the preliminary injunction standard weigh against Merit's request," including that Merit did not have a probability of prevailing on the merits.

Relatively little arbitration time was devoted to the complex issues related to this ONRR royalty.  These include the breadth of the Secretary's discretion in setting rates, the characteristics of oil in different parts of the country, index-based versus market-based pricing, retroactive adjustment of amounts due, and the process by which ONRR's rule was adopted.  The Interior Department, where Merit's administrative appeal is pending, has enormous expertise in this

complex area.  The federal court has already received briefing, heard oral argument, weighed evidence, and issued a 30+ page preliminary ruling regarding this dispute.

Although it is not uncommon for issues to be addressed simultaneously in multiple venues, and although the "involvement of an administrative agency in the enforcement of a statute is not sufficient to preclude arbitration," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), the Panel concludes that in this instance it is preferable to defer resolution of this issue to other bodies with greater expertise and/or a more complete record.  The Tribes have affirmed that they are not seeking a double payment by raising this issue in arbitration, and it is undisputed that Merit is currently paying royalties on Circle Ridge oil consistent with current government requirements. It makes little sense for this Panel to take up a claim that is pending in both an administrative agency having greater expertise and a federal court. *Wilkinson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 991 P.2d 1228, 1233 (Wyo. 1999).  Accordingly, we decline to take up, or to grant relief to the Tribes on, this counterclaim.

*Alleged Failure to Invest*.  Finally, the Tribes contend that after January 1, 2020 (when the Tribes argue the Lease terminated), Merit failed to make necessary investments in the Circle Ridge Field in violation of sections 7.1 and 8.0.1 of the Lease. They contend that the parties' December 2019 stipulation requires Merit, during the arbitration, "to perform all obligations imposed on it by the Lease," and that § 7.1 requires it to "exercise reasonable diligence in drilling and operating wells for Oil and Gas" on Circle Ridge.  Perhaps not surprisingly, Merit declined to expend millions of dollars to drill new or enhance old, wells during this arbitration absent an agreement that it would be reimbursed in the event it lost in arbitration and had to depart the field. Although the Tribes contend that Merit's reimbursement proposal was invalid because it demanded additional compensation for action it was already contractually obligated to undertake, the Panel

does not view it that way.  First, as the Tribes point out, Merit (with no protest or allegation of breach from them) had not drilled any new wells on Circle Ridge during its four prior years on the Lease.  The Tribes did not explain why, if "reasonable diligence" did not require new wells during the previous four years, new well drilling would be required during the interim holding period of the stipulation?

Also, we find that Merit acted reasonably in seeking to avoid a loss of investment capital in the event the Tribes prevailed in terminating the Lease, *Porter v. Moore* 252 S.W. 95, 97 (Ky. App. 1923) ("[Plaintiffs] will not be heard to ask a cancellation of the contract because of delays resulting from their attempts to defeat it.")  Given that the Panel has found that Merit's negotiating conduct *vis-à-vis* the Lease was in good faith, there is no basis for imposing on Merit a requirement that it put further investment in the field at risk. The Tribes made no showing that a temporary suspension of investment would do irreparable damage to the Circle Ridge reservoir (section 8.0.1), cause the Lease to not produce in paying quantities, or to be otherwise imprudent (section 7.1). A major component of the parties' negotiation was to try and reach agreement on an economic framework that would encourage the type of investment that both the Tribes and Merit believed would be beneficial. We hold that Merit's choosing not to invest beyond maintenance of existing production pending the outcome of this arbitration was not unreasonable.

For the foregoing reasons, none of the Tribes' counterclaims is granted.


### PARTY RIGHTS UNDER SECTION § 5.1 GOING FORWARD

Merit believed that production from Circle Ridge would decline without further investment to stimulate production. It therefore consistently proposed a lower royalty rate combined with a bonus for production over a set level.  Because this required sophisticated geoengineering analysis,

it offered the Tribes funds to hire their own petroleum engineer to evaluate the offer and assess the likely decline rate, but did not provide the Tribes with information they requested which Merit deemed proprietary.  This included costs of operating the field, what Merit's revenue gains were within the field, and what Merit would be investing in the field under the tiered royalty approach. (Tr. 919)

The Tribes did not respond to Merit's offer to fund an expert because they got a federal grant to hire a petroleum engineering firm recommended by the BIA's Division of Energy and Mineral Development (DEMD), MI3, to evaluate Merit's offer.  MI3 informed the Tribes that Merit's decline rate was, in their opinion, too high. (Tr. 1051-2) However, the Tribes never informed Merit of this so that they could discuss a proper decline rate or an alternative royalty rate. This was because the Tribes' trustee, DEMD, informed the Tribes it was their opinion that the Tribes should not renew the Lease and should instead operate the field themselves without a lease. (Tr.961-63) The WRITC decided to follow the advice of MI3 and DEMD and in September 2019 informed Merit the Lease would not be renewed.  Merit was understandably stunned and ultimately filed this arbitration. Nonetheless the parties continued to discuss an arrangement whereby Merit would operate the Circle Ridge field on behalf of the Tribes.

Like many matters which proceed to litigation or arbitration, this case is one of classic miscommunication resulting in misunderstanding, likely compounded by differences in cultural and linguistic negotiating styles. The Tribes were focused on a goal of consistent revenue to maintain their governments at current levels, but did not effectively communicate this to Merit. The Tribes therefore took it as disrespectful that Merit would never address their offer (which the BLM had recommended, Tr.922-3) to maintain a 29% royalty without a bonus and, instead, kept offering lower royalty rates with a bonus. Merit sought to maximize the total output of the field

over the long term but did not know the Tribes had been advised by MI3 that Merit's decline rate was incorrect and disadvantageous to them. Thus, the negotiators were like two ships passing in the night. Again, this is also why the Panel finds that both sides acted in good faith both with respect to the course of their negotiations and the offers they made in those negotiations.

On January 9, 2020, ten days after the Primary Term expired, MI3 advanced a proposal to operate the Circle Ridge field for the Tribes and guaranteeing a 29% royalty (Tribes Ex. 210). As of the close of the hearing, the Tribes had not accepted MI3's offer. The Tribes contend that Merit lost the right to enforce its preferential right to renew the Lease when the Primary Term ended on December 31, 2019 and because the Tribes made a decision not to enter into a lease. The evidence was clear that the Tribes lacked the intent or expertise to operate the Lease themselves directly. Instead, while retaining Tribal ownership, they intended to get an experienced oil company to operate the Lease — and clearly hoped and intended that Merit would be that company. Merely changing the name of the Lease to an "operating agreement," however, did not invalidate Merit's preferential right to renew. *Miller v. LeSea Broadcasting, Inc.,* 87 F.3d 224 (7th Cir. 1996); *Estate of Hensley, Matter of,* 413 N.E.2d 315,317 (Ind. App. 1980).

While the Lease granted Merit a right of first refusal only until December 31, 2019, and while MI3 did not make its operator offer until January 10, 2020, MI3 had had an insider relationship with the Tribes since at least September 2019.  MI3 advised the Tribes to terminate the Lease, and MI3's failure to honor this Panel's subpoena to appear and produce documents at the hearing prevented the Panel from understanding better what transpired between MI3 and the Tribes. While there is no evidence that the Tribes participated in any attempt to interfere with Merit's preferential right, neither Merit nor the Panel had the opportunity to examine the possibility of MI3 using inside information to bid on the operator contract. *Waste Connections of Kan., Inc.*

*v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250 (Kan. 2013) (party which has preferential right entitled to discovery on secret negotiations); *Savery v. Duane*, 21 LCR 275 (Mass. Land Court 2013) (discovery required to make a fair decision in similar dispute).  For this reason, Merit should be allowed to match any timely offer tendered by MI3 or any other third-party lease or contract operator.

Additionally, the parties' stipulation continues the Lease while this arbitration is pending. By the terms of the stipulation, the Lease will terminate 120 days after this Panel's final award. Therefore, in order to give meaning and value to the Lessee's preferential right from achieving production in paying quantities, the Panel finds that, notwithstanding the expiration of the Primary Term, and in order for the good faith requirements of section 35 to be fulfilled, the best path to a resolution that incorporates both the goals of the parties and the language of the Lease is to allow Merit to match the terms of any bid to act as operator within 120 days following this decision. *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.* 13 F.3d 330 (10th Cir. 1993) (even though agreement not technically in effect when dispute arose it provided for arbitration of any dispute arising out of business transactions).

Accordingly, the Tribes are directed, within 90 days of the date of this Award, to provide Merit a copy of any bona fide new third-party lease or contract operator agreement they are prepared to accept.  Merit will then have 30 days to make its election regarding whether to match and adopt those terms under its preferential right or not. If Merit chooses not to match, the Lease will expire with the exception of those rights, duties and obligations that continue after expiration of the Lease (*e.g.,* sections 10, 20, 30). The implied and express obligations of good faith continue to apply.

## VI.  DISPUTE RESOLUTION EXPENSES

In the vast majority of U.S. court litigation each side bears their own litigation costs. Although this is also usually the case in arbitration, arbitration is different in that it is a creature of contract, and importantly, the specific terms of the parties' specific arbitration agreement.

Section 20.0.5 of the Lease provides what Merit aptly characterizes as "a robust dispute-resolution mechanism." [PostBr p1].  It states that "if any dispute is resolved by settlement between the parties, each party shall bear its own expenses."  However, in the event the parties do not settle, it also provides that "reasonable expenses of dispute resolution … including but not limited to attorney fees and expenses, *shall* be paid by the losing party..." (emphasis added).  The plain common sense meaning of this fee-shifting language indicates the contracting parties' intent to encourage settlement, discourage expensive litigation, and/or to reduce the scope of any litigation that occurs.  The Panel must give meaning to this section of the Lease as well as the other sections previously analyzed.  Lease § 20.0.5 further provides that "in the event each party is partially successful, [attorney fees and expenses] shall be apportioned between the parties in the reasonable discretion of the arbitrators."  Again, the Lease wording is "shall" not "may."

Given our resolution of the claims, it appears the dispute may still be settled, albeit largely on the Tribes' terms. In the event Merit matches any offer to operate the Circle Ridge Lease within the 120-day limit set forth herein, no attorney fees are assessed. If, however such an "extension of the Lease" is not agreed to by Merit and the Tribes, attorney fees must be assessed under § 20.0.5 of the Lease.

In our analysis above, the Panel rules against Merit on the majority of its four major contentions.  Regarding Merit's contention that "the Lease continues by its terms so long as production remains in Paying Quantities," [PostBr 2] the Panel finds that the Lease is not a held-

by-production lease and that hearing evidence demonstrated that the parties' course of conduct throughout reflected this.  The Panel's ruling also rejects Merit's third contention that "the Tribes violated their express obligation to act in good faith."    This Award also finds against Merit's fourth contention that "the panel can – and should – set the reasonable renewal terms," including specifically the 20-year 24% urged by Merit [Post Br 20].

Merit's right to a preference under the Lease language is however, partially successful. The Panel rejects Merit's claim that the preference gives it an absolute right to a renewal of the Lease. However, the Panel finds that the preferential right to renew the Lease is not worthless and does provide Merit an opportunity to match any timely offer to operate the Circle Ridge field.

The Panel also finds the Tribes' counterclaims are unsuccessful.  The counterclaims alleged bad faith by Merit which, as discussed above, we reject. The first counterclaim plead their interpretation of section 5.1. While we have dealt with those arguments above, for purposes of assessing fees, we note that the Tribes did prevail on the argument that the Lease will terminate absent agreement by the Tribes on lease or operatorship terms. They did not prevail on their demand for disgorgement.

The Tribes' other counterclaims pertained to information sharing, abuse of the arbitration process, environmental violations, royalty underpayment, and failure to make necessary investments on the leasehold.  On the first hearing day, the Tribes voluntarily dismissed the first, and they functionally withdrew the second by presenting no evidence regarding it and not mentioning it in their post-hearing briefs.  The Panel rejects the environmental violation and investment failure contentions above, and defers resolution of the Tribes' royalty underpayment claim to the Wyoming federal court and the DOI administrative appeal process.

When we evaluate relative issue importance, the parties agreed that section 5.1 was the crucial issue. Merit explained in its opening statement that "the critical issue in this case…is whether this lease is maintained…whether that's through a continuation or renewal theory." [Tr. 60]. The Tribes concurred in post-hearing briefing that "Merit's contentions are, and always have been, the crux of the dispute." Regarding the counterclaims, Merit called them "not real," but rather "make weights" and (quoting a Tribal consultant) "anything you can think of" counterclaims [Tr. 54]. As Merit stated "this case comes down to one overarching issue…does the lease just go away or is it maintained?" [Tr. 7].

Lease § 20.0.5 provides that "in the event each party is partially successful, [attorney fees and expenses] shall be apportioned between the parties in the reasonable discretion of the arbitrators."  As noted, if the parties are successful in reaching a lease or an operating agreement within 120 days of this Final Award, the Panel considers the matter settled and no fees are awarded. In the event no agreement is reached, we find the Tribes, although not prevailing on their counterclaims, partially prevailed by terminating the Lease, which is the issue that all agree was most important and that took up the most time for all involved. Exercising our § 20.0.5 discretion, we hold that Merit is directed to pay to each Tribe 50% of the amount of their attorney fees and expenses, including the expenses of this arbitration.

Although given the proliferation of issues and arguments that arose from the filing of the arbitration, there is no way to calculate the apportionment of mathematically "reasonable attorney fees," we feel the 50% approximates equity in the present situation. *Hales v. Monroe,* 544 F.2d 331,332 (8th Cir. 1976); *Ridge Oil Co., Inc. v. Guinn Investments, Inc.,* 148 SW 3d 143,161 (Tex. S. Ct. 2004)( Whether it is "equitable and just" to award attorney's fees depends not on direct proof, but on the concept of fairness) We reach this conclusion in part because the role of MI3 not

revealed until late in the lengthy negotiations was opaque until MI3 made its offer to become the operator of the Lease ten days after the expiration. Moreover, while Merit clearly had the chance to renew the Lease on its present terms it was never given the MI3 calculations as to why its reservoir decline rates were excessive. While it is true the Tribes had no duty to reveal the role or advice of MI3 or Kelly Laurel, and we made no finding of bad faith by the Tribes, an inordinate amount of discovery and hearing time was expended on ferreting out the Tribes' motives in terminating the negotiations in September 2019. This, combined with the failure of the Tribes' counterclaims and the recognition that Merit's preferential right must be honored with respect to third parties are the reasons we are awarding the Tribes 50% rather than a higher portion of their fees.

Accordingly, the Panel apportions attorney fees and expenses as described and retains jurisdiction only to the extent necessary to resolve any payment disputes if the Parties do not settle as described above. Otherwise, this Award is a Final Award regarding the merits of the case and for purposes of the parties' stipulation commencing the 120-day deadline for expiration of the Lease.

## DECLARATIONS

In summary:

Merit's request for a declaration that the Lease did not terminate on December 31, 2019 due to it achieving production in paying quantities is DENIED;

Merit's request for a declaration that the preferential right entitled it to renew the Lease is DENIED;

Merit's request for a declaration that the Tribes acted in bad faith in violation of the Lease is DENIED;

Merit's contention that this panel has the authority and responsibility to declare new lease terms going forward is DENIED;

The Tribes' request for a declaration that the Lease expired on December 31, 2019 is ALLOWED, subject only to the Parties' stipulation that Lease provisions continue in effect until 120 days after a Final Award in this arbitration or settlement by the Parties;

The Tribes' counterclaim request for a declaration that Merit violated the Lease by committing environmental violations is DENIED;

The Tribes' request for a declaration that Merit violated the Lease by failing to make additional capital investments in the field during the pendency of this arbitration is DENIED;

The Tribes' request for a declaration that Merit violated the Lease by underpaying royalties due them is DEFERRED to the BIA administrative appeal process and/or the Wyoming federal district court;

The Tribes' request that Merit be ordered to pay their reasonable attorney fees and expenses is PROVISIONALLY ALLOWED IN PART:  Merit is directed to pay 50% of each Tribes' reasonable attorney fees and expenses, including arbitration expenses, unless Merit exercises its preferential right to match any timely third-party proposal, in which case no attorney fees or expenses are awarded.  The Panel retains jurisdiction only to the extent necessary to resolve any payment disputes if the Parties do not settle as described above. Otherwise, this Award is in full settlement of all claims and counterclaims submitted to this arbitration, other than those over

which this panel has specifically retained jurisdiction, and all other claims and counterclaims not expressly granted in the Award are denied.

So ordered,

Bruce D. Black, Arbitrator

_____
Eric E. Van Loon, Arbitrator

_____
Brad McKim, Arbitrator

Dated: November ____, 2020

which this panel has specifically retained jurisdiction, and all other claims and counterclaims not expressly granted in the Award are denied.

So ordered,

_____

Bruce D. Black, Arbitrator


_____

Eric E. Van Loon, Arbitrator


_____

Brad McKim, Arbitrator


Dated: November 18 2020